May it please the Court, I would like to reserve five minutes for rebuttal. Your Honors, my clients, the appellants, are a Fair Housing Council, a non-profit organization, a homeless man, or was homeless at the time that the facts occurred in this case, and also a woman who is a recovering substance abuser. Both of those individuals resided in the appellee's facilities, and both allege that they were subjected to religious discrimination in violation of the Fair Housing Act. And the appellant, Ms. Cowles, also alleges that she was subjected to discrimination on the basis of gender or sex. The District Court ruled that the homeless shelter facility that the appellees operate is not a dwelling under the Fair Housing Act, therefore the Fair Housing Act does not apply. Now the District Court acknowledged that the appellees admit that their substance abuse treatment facility is a dwelling, so that issue doesn't pertain to that facility. The District Court also ruled that the appellee's facility do not fall within the express religious exemption provided by the Fair Housing Act, that they do not qualify for that exemption. However, the District Court ruled that they are protected by the First Amendment. And then with regard to the interference claim pursuant to Section 3617 of the Fair Housing Act, the District Court didn't get to that issue because it found that the appellees are protected pursuant to the First Amendment. And it also dismissed the sex discrimination claim for lack of personal knowledge on behalf of Ms. Cowles. Now the dwelling issue, this Court has ruled that homeless shelters are dwellings under the Fair Housing Act, and that's the Turning Point case, which came out of Idaho as well. And the appellees urged this Court to, in its briefs, to look very closely at the number of days that an individual is allowed to stay at the homeless shelter. That has been a factor that's been considered by courts in determining whether a facility is a dwelling or not under the Fair Housing Act. But I would urge you to abandon that test, especially with regards to a homeless shelter, because what it could result in is a race to the bottom. If the operators of homeless shelters want to get out from application of the Fair Housing Act, they can keep reducing the number of days that a homeless person is allowed to stay in their facility. Counsel, in this particular case, if we were to disagree with you about the applicability of the religious exemption or the applicability of the First Amendment, would we have to reach the definition of dwelling or could we simply assume that even if it's a dwelling, the defendants would win? I know you don't concede those points, but just theoretically, would that be an appropriate way to reason the case? So if the Court found that either the religious exemption provided by the Act applies or the First Amendment protects the appellee's activities, then you wouldn't need to get to the dwelling issue. Now, my concern, though, is that if these operators of homeless shelters keep reducing the number of days, the maximum stay, eventually they may hope to get to some magic number, but I think the more important consideration is, as the Woodsby Foster case, which is cited in my brief, held that you also need to consider the fact that a homeless shelter is the home of a homeless person. They have no other place to return to. And I think that was the more persuasive consideration for the Woodsby Foster case, and I would urge you to look very carefully at that component of a homeless shelter's stay at a facility. With regards to the religious exemption, now, I would point out that as this Court requested the opinion of the Secretary of HUD on some of these issues, the Secretary has agreed very strongly with the appellant's argument that these are dwellings. And oddly, though, the Secretary feels that the district court erred and should have ruled that the religious exemption applies. And I say that's oddly. First of all, I don't even feel that that issue is properly before this Court. That wasn't appealed by the appellees, and it wasn't. Sotomayor, aren't we free to affirm the district court on any ground that was raised below and supported by the record? I think the court, yes, the court is free to do that. So is it your argument that the statutory exemption wasn't raised or? It was raised, Your Honor. So why wouldn't we be free to decide on that basis if we were to agree with the Secretary on that point? And I think you could. The concern is that the district court clearly ruled against the appellees on that issue. But so what? I guess that's my question. Why does that make any difference where the issue was raised? If we were going to reverse the judgment, there would have to be a cross-appeal. But when it's merely another theory for affirmance, why does there have to be a cross-appeal? And I understand, and I think that you are free to consider the issue. I would disagree with the Secretary of HUD's position on the issue, because my concern is that, at least with regards to religious organizations, it would undermine the express exemption that's provided by the Act itself. Because the Secretary seems to be arguing that, contrary to the U.S. v. Hughes memorial home case, which denied application of the religious exemption to a religious organization because it found that the program was open to individuals of all creeds, of all religions. But if a program is open at the front end to people of all religious groups, does the organization then forfeit its right later on to cut back on services on a discriminatory basis? I think that it does, at least in light of the U.S. v. Hughes memorial home case. And I think it has to, Your Honor, because otherwise a religious organization can have its facility open to everyone once individuals who are, in this case, particularly vulnerable individuals, homeless people, recovering substance abusers, once they're in the facilities, then they can be subject to, as they allege here, religious conversion or coercive religious indoctrination. And so it wouldn't make sense to allow them to have the facility open to everyone and then to say, but once you start discriminating, then you can claim the exemption. That seems to turn the exemption on its head, in my opinion. Is there any difference in the language in the exemption which permits preferences or the granting of preferences at the front end versus dealing with later conduct? Well, the religious exemption states that nothing in the subchapter shall prohibit a religious organization, association, et cetera, from limiting the sale, rental, or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion or from giving preference to such persons. Is the preference limited to a preference exercised at the front end? That is the admission. The statute doesn't specify that it's at the front end, but as far as I know, the only courts that have considered the issue have held that if the program is open, generally open to everyone, then it's not doesn't qualify for the exemption. This Court has recently ruled in the Balvich v. Riderwood improvement and service association case that the HUD's reasoning in amicus brief is only entitled deference if it reflects the agency's fair and considered judgment on the matter. And so I would urge this Court to find that the Secretary's opinion on this is not fair and considered because it will undermine a significant portion of the Fair Housing Act and allow religious discrimination to occur in what I perceive as a coercive atmosphere by letting people in at the front end and then bringing a course of religious indoctrination on them once they're in the facility. And it's particularly concerning, as I indicated, with these two facilities because Appellant Cowles is a substance abuse recovery individual who was in a facility that she wasn't allowed to leave, was there rather than staying in jail. And her option was to return to jail or to convert, and that's an extremely coercive situation. Well, it is, but that was caused by the state, not the facility, right? Yes, but that's not an unusual situation for individuals to come into these facilities, and either the Fair Housing Act protects their right to be free from religious discrimination or it doesn't. And in this case, the district court ruled that these organizations can't be required to respect those rights, and I think that's contrary to this law. Do you think the result would be any different if it were not as the result of a court proceeding? In other words, if the person knew from the outset that this was a religiously-based program and that people who entered it were either expected to be Christian or interested in potentially converting to Christianity, and in the absence of the state telling her to go there, what would be the statutory problem in this case? I think if the program is open to individuals of that faith, if they say you need to be of this faith to finish the program, then I think they qualify for the religious exemption. Well, isn't that exactly what they did here? They said you either have to be Christian or willing to consider conversion to participate? They didn't indicate that up front. I don't believe that's in the record. I believe that's in the record. I thought she signed something saying that that was the case. She signed something that indicated that she understands this is a religious-based program, but that doesn't mean that she has to be a member of their religion. And the concern is that these appellees will let individuals of other religions in, of other sects, other Christian faiths, and then require them to convert not to Christianity but to their particular brand of Christianity. And so there's evidence in the record that there was belittling of Mormons and other Christian faiths. So this isn't just open to Christianity, but you have to convert to our particular faith. We have about two and a half minutes left. Do you want to reserve?  Thank you, Your Honor. May it please the Court. My name is Luke Goodrich, and I represent the Boise Rescue Mission. Plaintiff's claims under the Fair Housing Act fail for multiple independent reasons. First, the homeless shelter is not a dwelling. Second, there's no connection to any sale or rental of a dwelling. Third, even if no connection were required, no dwelling has been made unavailable or denied here. And fourth, the claims against the discipleship program would violate the Religious Freedom Restoration Act and the First Amendment. But as Judge Graber pointed out, this Court doesn't need to reach any of these issues because the plaintiff's claims fail for a fifth independent reason. They fall within the terms of the Fair Housing Act's religious exemption. That was the conclusion of the Department of Housing and Urban Development, and that is a simple and narrow ground on which to affirm the district court. What level of deference do we owe the briefing position of the secretary? I don't think the secretary gets any formal deference for positions asserted in its briefs. But in this case, the HUD's position happens to be perfectly consistent with the text of the statute and with reason, so I think it gets the same deference that any persuasive and right argument should get. And here, by its terms, the religious exemption bars certain types of claims, claims that would prohibit a religious organization from giving preference to persons of the same religion. And that's exactly what both of the plaintiff's claims would do here. The claim against the discipleship program would prohibit that program from limiting membership to persons who are Christians or want to be Christians, and that's certainly limiting occupancy and giving of preference on the basis of religion. Does it change the situation if the resident is there or the person is there by virtue of court order? No, Your Honor. You know, I mean, it seems to me, one of the odd things about this case, it starts with a court order that says you complete this program with a religious institution or you go to jail. And there may be some other problems with that that aren't associated with this case, of course, but it seems to me that an argument can be made that if you accept a person under those circumstances, it may well be a different situation. So explain to me why a court-ordered, a person there under a court order, should be treated the same as someone who comes in voluntarily. Well, if someone were truly court-ordered to be in a Christian program and had no secular alternative, that would be a plain and blatant violation of the Establishment Clause. That's very clear. But here there's no Establishment Clause. Who would be the proper defendant? And then go on to answer Judge Thomas's question. Would that be an Establishment Clause violation by the court in its sentencing order, or would it be something that the receiving organization would be a defendant in? It would be a violation on the part of the State, whether it's the court or if the court were acting pursuant to a State law or a State regulation. Right. I mean, we don't need to get into those issues here because obviously the State isn't a defendant and that theory hasn't been pled. But I guess my question is a little more narrow, and that is, you have the situation where your client is reporting to a parole officer. Your client is accepting the court order, accepting the person into the program under the aegis of a court order. My question to you is why doesn't that change the calculus in which we view this? Well, for multiple reasons. One is there's no Establishment Clause. You know, one theory could be it would be an Establishment Clause violation. Another theory would be that somehow the Fair Housing Act applies differently depending on whether someone's under a court order or not. And I think the Establishment Clause claim fails for multiple reasons. It's waived. It's the wrong defendant. The Fair Housing Act claim, nothing in the Fair Housing Act suggests that anything is different depending on whether someone's been ordered to go somewhere based on a court order. And we would point to the religious exemption, and basically it allows religious organizations to give preference to persons of the same religion, which plaintiff's counsel just admitted that that's exactly what's been done here. The discipleship program is open to people who come from court orders or people who just come off the street. And regardless of who comes in, the policy is the same. You either have to be a Christian or you have to want to become a Christian, and that's a preference on the basis of religion. I have a slightly different question having to do with the scope or extent of the preference statutory exemption. Part of the claim here is that there was derision towards the plaintiffs, the individual plaintiffs. I mean, there were also preference questions like getting at the back of the line for food or those are sort of more preference issues. But there were also claims of active hostility being directed towards these individuals. Do those claims survive? And if not, why not? No, Your Honor, they don't survive. I think it's important to look at the precise allegations, which were that for Plaintiff Chinn it was that he heard comments at the chapel service that were offensive to his Mormon faith. And for purposes of the religious exemption, the question is whether there's a preference for persons of the same religion. And I would agree that you can imagine two different types of religious discrimination, sort of a no Jews allowed, a rule that harms one particular religious group or two particular religious groups, and that's not covered by the religious exemption. But basically advocating for your own religion or giving preference to members of your own religion or persons who agree with your religion, that is covered by the religious exemption. And I don't think Plaintiff has alleged any differential treatment because he was a Mormon. He alleges that people who attended religious services, Christian religious services, got better treatment. What is your response to counsel's argument that once a facility is opened to all comers, or at least to non-co-religionists, that the exemption is lost? I mean, you have the Chabad house, Jews only, but we don't really have enough people to fill our facility so we'll let other people in. Is the exemption lost? No, Your Honor. Plaintiff cited Hughes Memorial Home. In that case, I don't know why he's citing it. It's completely irrelevant. It was undisputed that the children's home in that case was not a religious organization. That case is off the table. The most relevant cases come from the Title VII, the parallel religious exemption in Title VII. And there you have the Laboon case from the Third Circuit. That's 503F3229. And you have multiple cases under the Title VII religious exemption that say you don't have to have a blanket policy of only hiring co-religionists in order to benefit from Title VII's religious exemption. Laboon was a Jewish community center that hired a bunch of Gentiles and then eventually fired one of those Gentiles, and that person sued for religious discrimination. And the court held that even though the Jewish community center hired Gentiles, actually hired a majority of Gentiles, it didn't waive the protection of the religious exemption. The same result was in the Eleventh Circuit case involving Samford University. That's Killinger v. Samford University. There was a Sixth Circuit case by the name of Hall. And then this Court's recent decision in Spencer v. World Vision, it was dicta, but the Court said the same thing. Basically, under Title VII, you don't waive the protection of the religious exemption by hiring people of a different religion. And actually, the plaintiff's argument on this point would have a very perverse result because religious organizations that try to be welcoming to people of all faiths and try to be open would actually get penalized. And so the incentive would be, the only way you can benefit from the religious exemption would be to exclude everybody who doesn't agree with you. And that would basically make housing less available, which is contrary to the purpose of the Fair Housing Act. Another problem with the plaintiff's argument under the religious exemption, basically the plaintiff is trying to use the word religion differently in different parts of the statute. This was pointed out in HUD's brief at page 27. The plaintiff wants to say that a preference on the basis of chapel attendance is a preference on the basis of religion for purposes of discrimination, but it's not a preference on the basis of religion for the religious exemption. And the plaintiff can't have it both ways. It's sort of a double-edged sword. Either the plaintiff's right, and they've failed to state a claim for religious discrimination because a chapel preference is not the same as a preference on the basis of religion, or as HUD points out, religion includes specific observances and practices, and so the plaintiff's claim falls within the religious exemption. I'd also point out that Title VII includes a definition of religion, and it's not, as plaintiff would have it, limited to denominational beliefs, sort of abstract beliefs that everybody has to agree to. It includes specific observances and practices. That definition's at 42 U.S.C. 2000e subsection J, and it states, quote, religion includes all aspects of religious observance and practice, as well as belief. And this Court has repeatedly looked to Title VII when interpreting the Fair Housing Act. And if you do that with this religious exemption, it shows that a preference on the basis of a specific religious practice, such as attending Christian chapel services, is a preference on the basis of religion, and so it falls within the religious exemption. Finally, I think the plaintiff's theory of the religious exemption creates some pretty serious entanglement problems. If the Court has to look at everybody who gets a preference and then look at the religious organization and decide who has the same religious beliefs, is this person a Christian, an evangelical Christian, are Mormons and Christians the same or different, it quickly gets the Court into deep theological waters. But if you look instead, what's happened here, as HUD points out, page 26 of its brief, it says that by either requiring attendance at chapel services or giving preference to persons who attend Christian chapel services, the shelter has created a housing opportunity that's better suited to Christians than it is to people of other faiths. And that creates a de facto preference for persons of the same religion. Unless there are further questions on the religious exemption, I'd like to turn to the dwelling issue. And there I think it's helpful at the outset to kind of take a step back and look at the big picture. And it's undisputed that homeless shelters are currently regulated under federal law as places of public accommodation. Both Title II of the Civil Rights Act and the ADA lumps homeless shelters together with hotels, bed and breakfast, and motels and regulates them as places of public accommodation. So there's no question here, no matter how few days the homeless shelter allows people to stay there, there's no question they can't escape from Title II or the ADA. Where's the line, though? If someone operates something that's called a homeless shelter but a person can stay there for six months or a year or three years until they get back on their feet, does it become a dwelling at any point? And if not, why not? Yes, Your Honor. We fully agree that some homeless shelters can be dwellings. And it depends on the two factors, predominantly on the two factors identified by the Third Circuit and the Eleventh Circuit. Both have looked at the same thing, the length of the stay and whether the guests are able to treat the building as a home. And on this issue, the plaintiffs bear the burden of proof. It's not our burden to show that it's not a dwelling. And plaintiffs can't point to a single case involving stays as short as those at issue here or involving conditions and restrictions on the ability of guests to treat the building as a home as are at issue here. The guests here are kicked out of the building for eight hours a day with the exception of a brief return for lunch. They can't have any guests or visitors. They can't even control their own hygiene. They have to shower every night whether they want to or not. They have to sleep in the pajamas provided by the shelter. Their bodies and their belongings are subject to search at any time without notice. I mean, this takes the home or shelter, it's nothing like a home. It's not even like a hotel. It's getting closer to a prison atmosphere, which may not be pleasant for the guests, but it's essential to maintain the safety of all the guests. Finally, I'd point to HUD's regulations, which I think also support our position on the dwelling issue. HUD points to two different regulations. One is a final report on model building codes that offers six factors for a dwelling. I think those are great factors. Five of the six strongly support our position that the home or shelter is not a dwelling. The other is 24 CFR 100.201, and HUD never quotes the full regulation, but it actually gives four examples of what constitutes a dwelling unit. Single family home, an apartment unit, dormitory rooms, and homeless shelters, quote, intended for occupancy as a residence. And only one of those four has a qualifier. Single family residences, apartment units, dormitory rooms, those are always dwellings. But homeless shelters, according to HUD's regulations, are dwellings only if they're intended for occupancy as a residence, and that turns you right back to the statutory language. So for all these reasons, plaintiff's attempt, plaintiff's claims are an attempt to stretch the Fair Housing Act beyond what its text, purpose, or history would allow. And I respectfully ask that you affirm the district court. Roberts. Thank you, counsel. Roberts. Your Honor, it's my earlier allegation that looking very specifically at the number of days that you stay in the shelter is perfectly exemplified by opposing counsel's description of this shelter as practically like a prison. Your Honors, I represent a fair housing organization that has very serious concerns about the direction that fair housing enforcement is going in this country, and individuals who are trying to get out from under the protections afforded by the Fair Housing Act. And this is a perfect example. We are in a race for the bottom because these organizations are doing everything they possibly can to get these shelters out from being considered dwellings and into some other situation so they can do as they please once they gather in their potential flock. They have turned this organization into a tool of religious indoctrination. They allow them in at the front end. Everyone's welcome. But you're going to get preferential services if you become one of us, and that's a very troubling situation, I believe. The opposing counsel states that or predicts the slippery slope of the court will get into deep theological waters by having to determine who is in the religion and who is not. We've never seen the case, Your Honors, and I don't believe that it would arise because individuals understand that when they go and an organization says, this is Christian housing. This is you need to be a member of our church or a member of our faith. If individuals hear that at the front end, they understand that because everybody's entitled to their faith or to have no faith by the Constitution, and we respect each other's right to be free from religion or right to have their own religion. But what's your response to counsel's argument that that sort of a policy would diminish the opportunities available to the homeless and others because religious organizations would restrict their activities to their own rather than reach out? The purpose of the Fair Housing Act is not to guarantee housing. It's to guarantee discriminatory free housing, and that allowing them to do what they do will undermine the pool of nondiscriminatory housing in this country because it will allow religious organizations to operate facilities that let everybody in, but who you know you're going to be subjected to discrimination. Once you get in, the homeless individuals would say, I'm not going to go stay there because it's an insult to my religion. Thank you, Your Honors. Roberts. Thank you, counsel. The case is heard. It will be submitted for decision. And we'll be in recess.
judges: Thomas, Graber, Cjj Selna (C. Cal.), Dj